**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| CRAIG BILLIE, DAWN BILLIE, SARA DELUCIO, JANET HOPMAN, ANDRE KITTL, SHARON KITTL, DONALD MLADIC, SUSAN MLADIC, GERARD SABO, DONNA SABO, TODD STONITSCH, and REBECCA STONITSCH<br><br>Plaintiffs,<br><br>v.<br><br>VILLAGE OF CHANNAHON, JOSEPH N. COOK, JR., EDWARD S. DOLEZAL, THOMAS C. PAHNKE, DAVID J. SILVERMAN, JAMES F. BOWDEN, JANET L. SCHUMACHER, SAMUEL J. GRECO, CHANTAL S. HOST, SCOTT R. MCMILLIN, PATRICIA L. PERINAR, MARK E. SCAGGS, SCOTT R. SLOCUM, JR. and THOMAS J. DURKIN<br><br>Defendants. | **JURY DEMAND**<br><br>Case No. |

**COMPLAINT**

The plaintiffs, CRAIG BILLIE, DAWN BILLIE, SARA DELUCIO, JANET HOPMAN, ANDRE KITTL, SHARON KITTL, DONALD MLADIC, SUSAN MLADIC, GERARD SABO, DONNA SABO, TODD STONITSCH, and REBECCA STONITSCH by their attorneys, FUOCO LAW GROUP, LTD. complaining of the defendants, VILLAGE OF CHANNAHON, JOSEPH N. COOK, JR., EDWARD S. DOLEZAL, DAVID J. SILVERMAN, JAMES F. BOWDEN, JANET L. SCHUMACHER, SAMUEL J. GRECO,

CHANTAL S. HOST, SCOTT R. MCMILLIN, PATRICIA L. PERINAR, MARK E. SCAGGS, SCOTT R. SLOCUM, JR. and THOMAS J. DURKIN, pleading hypothetically and in the alternative, state as follows:

## NATURE OF THE ACTION

1. The plaintiffs seek redress, pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988 for acts by one or more defendants to deprive just compensation granted by the Fifth Amendment Takings Clause of United States Constitution and deprivation of federal statutory rights protecting life and property within the National Flood Insurance Program (NFIP), 42 U.S.C. § 4001 *et seq.*, the Flood Disaster Protection Act of 1973, 42 U.S.C. § 4002, and the FEMA Criteria for Flood Plain Management and Use (44 C.F.R. § 60.3) and other regulations.

2. The plaintiffs are all homeowners in the Indian Trails North, Unit 1 Subdivision, located in the Village of Channahon, Will County, Illinois whose houses were allowed to be newly constructed and approved for occupancy on lots included within a known DuPage River Special Flood Hazard Area (SFHA), as identified on one or more Federal Emergency Management Agency (FEMA) Flood Hazard Boundary Maps (FHBM) and Flood Insurance Rate Maps (FIRM).

3. The basement in each plaintiff's home serves as public flood water storage whenever DuPage River surface flood water accumulates in this flood plain. The plaintiffs have all consequentially suffered losses from recurrent damage or destruction

to essential home mechanical and electrical equipment as well as home structural and finish components, temporarily uninhabitable homes, impaired physical and mental health, diminished property values, and doubtful re-sale of their properties.

4. The plaintiffs alternatively seek redress by their inverse condemnation state claim against the Village of Channahon after this defendant's failure to initiate condemnation proceedings (735 Ill. Comp. Stat. 30/10-5-5) and has otherwise denied each plaintiff any compensation.

## JURISDICTION AND VENUE

5. This court has proper subject matter jurisdiction arising under federal law, pursuant to 28 U.S.C. § 1331 and state claim supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a).

6. Venue is proper in this court as the alleged acts giving rise to each plaintiff's claims arose in the Village of Channahon, Will County, Illinois, pursuant to 28 U.S.C. § 1391(b).

## THE PARTIES

7. Plaintiffs CRAIG BILLIE and DAWN BILLIE own Lot 16 improved with a single family house, excavated basement and septic system in the Indian Trails North, Unit 1 Subdivision, Channahon, Illinois.

8. Plaintiff SARA DELUCIO owns Lot 17 improved with a single family house, excavated basement and septic system in the Indian Trails North, Unit 1

Subdivision, Channahon, Illinois.

9. Plaintiff JANET HOPMAN owns Lot 15 improved with a single family house, excavated basement and septic system in the Indian Trails North, Unit 1 Subdivision, Channahon, Illinois.

10. Plaintiffs ANDRE KITTL and SHARON KITTL own Lot 14 improved with a single family house, excavated basement and septic system in the Indian Trails North, Unit 1 Subdivision, Channahon, Illinois.

11. Plaintiffs DONALD MLADIC and SUSAN MLADIC own Lot 11 improved with a single family house, excavated basement and septic system in the Indian Trails North, Unit 1 Subdivision, Channahon, Illinois.

12. Plaintiffs GERARD SABO and DONNA SABO own Lot 12 improved with a single family house, excavated basement and septic system in the Indian Trails North, Unit 1 Subdivision, Channahon, Illinois.

13. Plaintiffs TODD STONITSCH and REBECCA STONITSCH own Lot 13 improved with a single family house, excavated basement and septic system in the Indian Trails North, Unit 1 Subdivision, Channahon, Illinois.

14. Defendant VILLAGE OF CHANNAHON (Village) is a municipal corporation which has participated in the National Flood Insurance Program since 1983.

15. Defendant JOSEPH N. COOK, JR. (Cook) is the former Village President and past Village Trustee.

16. Defendant EDWARD S. DOLEZAL (Dolezal) is the present and long term Village Director of Public Works.

17. Defendant THOMAS C. PAHNKE (Pahnke) is the former Village Building and Zoning Officer.

18. Defendant DAVID J. SILVERMAN (Silverman) is the present and long term Village Attorney.

19. Defendant JAMES F. BOWDEN (Bowden) is the former Village Administrator.

20. Defendant JANET L. "MISSEY" SCHUMACHER (Schumacher) is the present Village President and past Village Clerk and Village Trustee.

21. Defendant SAMUEL J. GRECO (Greco) is a present Village Trustee with responsibility for Village finance and human resources.

22. Defendant CHANTAL H. HOST (Host) is a present Village Trustee with responsibility for Village Public Safety and Emergency Support.

23. Defendant SCOTT R. MCMILLIN (McMillin) is a present Village Trustee with responsibility for Village Natural Resources and Open Spaces.

24. Defendant PATRICIA L. PERINAR (Perinar) is a present Village Trustee with responsibility for Village community and legislative affairs.

25. Defendant MARK E. SCAGGS (Scaggs) is a present Village Trustee with responsibility for Village public works and facilities.

26. Defendant SCOTT R. SLOCUM, JR. (Slocum) is a present Village Trustee with responsibility for Village community development.

27. Defendant THOMAS J. DURKIN (Durkin) is the present Village Administrator.

**FACTS COMMON TO ALL CLAIMS**

**INDIAN TRAILS RESIDENTIAL SUBDIVISION DEVELOPMENT**

28. In 1992, two developers sought Village approval for a proposed Indian Trails residential single family housing development (Development) of one hundred (100) houses or more in total.

29. The unimproved and former agricultural land which the developers sought to develop is located within the DuPage River drainage basin which generally borders this land on the north and west.

30. The Village wanted this large Development for expansion of its municipal boundaries, population, tax base, and revenue stream.

31. The northern land segment on which the developers sought to begin the Development, called Indian Trails North Subdivision Unit 1 (ITN) had a slough bordering this land, which the Village knew was a DuPage River back water floodway. Normally five (5) to ten (10) feet across, the slough expands to two hundred (200) to three hundred (300) feet across during flooding events.

32. In 1992, the Village knew that the northern land segment sought to be

developed first was flood prone because of highly porous soil, of a sand-gravel mix typical of a flood plain, and burdened with a shallow water table depth beneath it of as little as approximately eight (8) to ten (10) feet.

33. In 1992, the Village knew or should have known that, as a hydrologic process, surface water flooding can and does permeate porous soil in and then over the flood plain banks which causes surface flood water to rapidly infiltrate the water table and, because of this added volume, the water table height rapidly rises closer to the surface of land.

34. In 1992, the developers depicted ITN with nine planned residential lots beside the slough which FEMA identified as a Special Flood Hazard Area (SFHA) with the zone designation "A" or "AO" shown on the applicable FIRM maps and two or more residential lots within the zone designation "B" adjacent to Zone A or Zone AO on the same FIRM maps.

**APPLICABLE FEMA NFIP DEVELOPMENT REGULATATORY STATUTES**

35. As a participating community in the NFIP, the Village had to obey and properly apply the NFIP FEMA regulatory statutes found at 44 C.F.R. §§ 59.1 – 60.26 when allowing new development in known flood prone, unimproved areas so that all new construction, including structures, was reasonably safe from flooding.

36. The Village had to obey and properly apply the FEMA "Criteria for Land Use and Management, 44 C.F.R. § 60.3(a)(3) (51 Fed. Reg. 30,307 (Aug. 25, 1986) to:

(3) Review all permit applications to determine whether proposed building sites will be reasonably safe from flooding. If a proposed building site is in a flood-prone area, all new construction and substantial improvements shall (i) be designed (or modified) and adequately anchored to prevent flotation, collapse, or lateral movement of the structure resulting from hydrodynamic and hydrostatic loads, including the effects of buoyancy, (ii) be constructed with materials resistant to flood damage, (iii) be constructed by methods and practices that minimize flood damages, and (iv) be constructed with electrical, heating, ventilation, plumbing, and air conditioning equipment and other service facilities that are designed and/or located so as to prevent water from entering or accumulating within the components during conditions of flooding.

37. The Village also had to obey and properly apply the "Criteria for Land Use and Management, 44 C.F.R. § 60.3(b)(5) (51 Fed. Reg. 30,307 (Aug. 25, 1986) as follows:

(5) Where base flood elevation data are utilized, within Zone A on the community's FHBM or FIRM:

(i) Obtain the elevation (in relation to mean sea level) of the lowest floor (including basement) of all new and substantially improved structures, and

(ii) Obtain, if the structure has been floodproofed in accordance with paragraph (c)(3)(ii) of this section, the elevation (in relation to mean sea level) to which the structure was floodproofed, and

(iii) Maintain a record of all such information with the official designated by the community under § 59.22 (a)(9)(iii);

38. The Village also had to obey and properly apply the "Criteria for Land Use and Management, 44 C.F.R. § 60.3(c)(7) to:

(7) Require within any AO zone on the community's FIRM that all new construction and substantial improvements of residential structures have the lowest floor (including basement) elevated above the highest adjacent grade at least as high as the depth number specified in feet on the community's FIRM (at least two feet if no depth number is specified);

39. The Village also had to obey and properly apply the "Criteria for Land Use and Management, 44 C.F.R. § 60.3(d)(3) to:

(3) Prohibit encroachments, including fill, new construction, substantial improvements, and other development within the adopted regulatory floodway unless it has been demonstrated through hydrologic and hydraulic analyses performed in accordance with standard engineering practice that the proposed encroachment would not result in any increase in flood levels within the community during the occurrence of the base flood discharge;

40. The Village had to also know and properly apply at a minimum the NFIP, 44 C.F.R § 59.1 regulatory definition of "Development" as "any man-made change to improved or unimproved real estate, including but not limited to buildings or other structures, mining, dredging, filling, grading, paving, excavation or drilling operations or storage of equipment or materials." which broadly covers an entire lot in scope.

41. The Village had to also know and properly apply at a minimum the NFIP, 44 C.F.R § 59.1 regulatory definition of "*Flood plain* or *flood-prone area* means any land area susceptible to being inundated by water from any source (see definition of "flooding")".

**<u>VILLAGE KNOWLEDGE OF APPLICABLE FEMA NFIP DEVELOPMENT REGULATATORY STATUTES</u>**

42. On April 6, 1992, the Village Board of Trustees passed Ordinance 703 which at Section 200.7 mandated as an expressed purpose, "[t]o comply with the rules and regulations of the National Flood Insurance Program codified at 44 CFR 59-79, as amended."

43. Defendant Silverman drafted and/or reviewed and approved Ordinance

703 in its final form and had familiarity when doing so with the rules and regulations of the National Flood Insurance Program codified at 44 CFR 59-79.

44. Ordinance 703 at Section 300.41 adopted as a regulatory Village floodway the DuPage River backwater flood plain bordering ITN Lots 13 - 17 as shown on the FEMA Will County Unincorporated Areas FHBM or FIRM dated April 15, 1982.

45. Ordinance 703 at Section 400.0 identified the "Building and Zoning Officer" as the Village enforcement official and defined other responsibilities, including developer plan review and permit issuance (Section 505.0), proper structure elevation at all development project construction phases (Section 506.0), as well as obtaining and maintaining Elevation Certificates for lowest floor elevation (including basements) in completed residential building (Section 507.0).

## VILLAGE REVIEW AND APPROVAL OF ITN SUBDIVISION PLAT AND LOTS 11-17 DEVELOPMENT

46. On September 29, 1992, the Village Plan Commission reviewed and approved the preliminary ITN subdivision plat in a meeting held with defendant Pahnke in attendance.

47. Silverman had reviewed the preliminary ITN subdivision plat and approved it before the September 29, 1992 Village Plan Commission meeting.

48. Pahnke and Silverman knew before this meeting of ITN's location in the SFHA and understood at that time the Base Flood Elevation (BFE) impairing ITN Lots 13 – 21 was five hundred twenty four (524) feet and the Zone B Five Hundred (500) Year

flood elevation impairing ITN Lots 11 and 12 was five hundred twenty five (525) feet.

49. Silverman next drafted and/or reviewed and approved the proposed annexation agreement in final form for ITN to become part of the Village before a scheduled Village Board of Trustees vote.

50. On November 16, 1992, the Village Board of Trustees approved the annexation agreement for ITN to become part of the Village and the ITN preliminary plat.

51. Silverman next reviewed and approved the proposed final ITN plat before a scheduled Village Board of Trustees vote and knew from doing so that unimproved ITN Lots 13 through 21 were within a SFHA, requiring the Village's compliance with applicable FEMA NFIP regulatory statutes found at 44 C.F.R. §§ 59.1 – 60.26.

52. On February 15, 1993, the Village Board of Trustees approved the final ITN plat, later recorded on April 14, 1993, with a surveyor's certification that ITN Lots 13 through 21 were within a SFHA.

**NON-COMPLIANCE WITH APPLICABLE FEMA NFIP DEVELOPMENT REGULATATORY STATUTES**

53. Beginning in September 1993 through August 12, 1994, the Village received an Application for Plan Examination and Building Permit (Permit Application) for each unimproved ITN Lot 11 through 17 to construct on each lot a new single family house with an excavated basement and excavated septic system improvement to each house.

54. Each Permit Application for each lot reflected lot grading, excavation and soil fill planned. Each house's mechanical and electrical plans submission identified

basement level placement of furnace, air conditioning, hot water heater and electrical junction box equipment as well as electrical outlets.

55. Pahnke reviewed each Permit Application submission for ITN Lot 11 through 17.

56. Pahnke consulted with Silverman as questions and issues arose for Silverman's legal advice concerning the scope and extent of required compliance with applicable FEMA NFIP regulatory statutes found at 44 C.F.R. §§ 59.1 – 60.26.

57. Pahnke did not apply the 44 C.F.R. § 60.3(d)(3) requirement of performed hydrologic and hydraulic analyses for a data based demonstration of whether Lot 11 – 17 were suitable for the development proposed in each Permit Application submission received, despite knowing of highly probable future slough flooding, the close proximity of the slough to each proposed development, the high soil porosity and shallow water table height conditions, the lower Lot 11 – 17 topography compared to other ITN platted lots, and the surface flood water infiltration of the existing water table which would occur beneath each lot during each future slough flooding event.

58. Pahnke did not apply 44 C.F.R. § 60.3(a)(3) and 44 C.F.R. § 60.3(c)(7) to require, as a Lot 11 – 17 development condition to account for surface flood water infiltration and the corresponding water table rise, that each proposed single family home had to be constructed with each basement (lowest floor) elevation no deeper than five hundred twenty five feet to make each completed house approved for occupancy

reasonably safe from flooding.

59. Pahnke did not comply with 44 C.F.R. § 60.3(a)(3) and 44 C.F.R. § 60.3(c)(7) when he did not impose this development condition when allowing Lot 11 – 17 development reflected on each approved house excavation plan because of the noted FHBM and FIRM five hundred twenty four (524) feet BF; needed inclusion of a one foot Freeboard safety factor defined by FEMA at 44 C.F.R. § 59.1; the Zone B flood five hundred twenty five (525) feet elevation; the regulatory requirement to protect basement located HVAC, hot water supply, and electrical equipment from flood water; and the aforementioned known existing conditions naturally burdening these flood prone lots.

**HAZARDOUS FLOOD PRONE HOUSES ALLOWED FOR CONSTRUCTION AND APPROVED FOR OCCUPANCY**

60. Pahnke, in service to the Village's desire for ITN development and as an accommodation to each builder, approved each ITN Lot 11 – 17 Permit Application without the regulatory required development condition that each completed house basement floor be no deeper than five hundred twenty five (525) feet above the North American Vertical Datum of 1988 (NAVD). .

61. Pahnke inspected phases of the approved on-going construction to improve each ITN Lot 11 – 17 and reviewed the completed improvements construction on each lot for occupancy approval.

62. Pahnke, when doing, so did not apply nor consider 44 C.F.R. § 60.3(b)(5) to obtain the actual basement floor elevation after excavation and before the concrete

foundation work while inspecting on-going house construction on ITN Lot 11 – 17.

63. Pahnke did not require each builder to submit an Elevation Certificate for the lowest basement floor in each completed house, required by 44 C.F.R. § 59.22(a)(9)(iii)), before granting each Lot 11 – 17 "Certificate of Occupancy and Compliance." This repeated failure jeopardized the Village's participation in the NFIP (44 C.F.R. § 59(a)(9)(iii)).

64. Pahnke first granted an ITN Lot 11 – 17 "Certificate of Occupancy and Compliance" on January 28, 1994 (Lot 13) and the last on December 19, 1994 (Lot 14). Each granted "Certificate of Occupancy and Compliance" certified only compliance with the Village's "Zoning Ordinance" and not NFIP FEMA Flood Plain Use and Management regulatory compliance to assure the approved houses which were reasonably safe from flooding.

**ITN LOT 11 – 17 1996 – 2009 BASEMENT FLOODING**

65. Each house on improved ITN Lot 11 – 17 experienced basement flooding on July 18, 1996 (estimated 525.7 flood water height); October 15, 2001 (estimated 519.7 flood water height); August 7, 2007 (estimated 520.0 flood water height); September 15, 2008 (estimated 522.4 flood water height); December 29, 2008 (estimated 521.9) flood water height); and March 2009 (estimated 520.1 flood water height).

66. On September 15, 2008, the Lot 16 house basement flooding exceeded three feet deep. The Lot 11, 12 and 15 house basement flooding approached or exceeded two

feet deep as examples of severity.

67. The Lot 11 – 17 households used one or more gasoline powered pumps located outside and connected hoses to supplement existing electric basement sump pumps. The gasoline pumps are run continuously for as long as it takes until the flooding event is over and the basements are pumped empty.

68. The recurrent flooding events even after the 1996 "five hundred year" (500) flood damaged or destroyed ITN Lot 11 – 17 basement located HVAC, hot water supply, and electrical equipment, wood framing, drywall, carpet, tile, furniture, personal possessions and caused or worsened house basement concrete wall and floor slab cracking. Unhealthy Radon gas concentration and mold in several homes resulted after the basements were pumped dry. The December 29, 2008 flood left some houses temporarily uninhabitable for lacking heat and hot water.

**<u>2009 VILLAGE DRAINAGE INVESTIGATION</u>**

69. Several ITN households contacted the Village to urge an investigation into the four basement flooding events which ITN Lot 11 – 17 and others experienced in eighteen (18) months.

70. Before February 24, 2009, the Village asked an engineering firm to create a proposal to perform a drainage investigation of the Indian Trails Development to determine the causes for significant basement flooding in ten households, including ITN Lot 11-17 and to propose potential solutions in a written report. Defendants Cook and

Dolezal received the engineering firm's written proposal dated February 24, 2009.

71. Absent from the engineering firm's written proposal sought by the Village was an investigation by the engineering firm into whether the Village had complied with FEMA's NFIP "Criteria for Land Use and Management" and other applicable NFIP regulations when approving ITN Lot 11 – 17 development and allowing the construction of basement floor levels below what was reasonably safe from flooding.

72. On March 2, 2009, the Village Board of Trustees with one dissent voted to approve engineering firm's written proposal.

73. The engineering firm performed the drainage investigation of the Indian Trails Development requested and provided an initial written report in June 2009.

74. The investigation included the measurement of ITN completed house basement floor elevation. The written report identified the ten (10) year flood elevation of five hundred twenty one (521) feet in the study area and the fifty (50) year flood elevation of five hundred twenty two (522.8) feet.

75. The written report Appendix 2 included individual ITN lot completed house basement floor elevation measurements (NAVD), with Lot 11 as 519.95', Lot 12 as 519.30', Lot 14 as 518.65', Lot 15 as 518.76', Lot 16 as 519.51' and Lot 17 as 519.71'.

76. The written report found a direct association between the DuPage River water surface elevation and ITN house basement flooding frequency and severity. The engineering firm determined the Channahon Dam downstream from ITN was

responsible for an increased, five (5) feet upstream DuPage River water height compared to the water height past the dam downstream.

77. The written report also included the study area sand and gravel porous soil condition as the means for the "easy transmission" of slough surface flood water inundating the backyards of ITN Lots 13-17 to raise the water table height.

78. With the Channahon Dam identified as the primary cause of increased upstream DuPage River water height to influence ITN water table height, the engineering firm's written report concluded with the recommendation for the Village to work with the Illinois Department of Natural Resources (IDNR) in design then underway of an additional dam spillway as a potential flood mitigation step.

79. The engineering firm also recommended Village consideration of a "slurry wall" or concrete barrier to bedrock to surround the study area to stop surface flood water from reaching the slough flood plain. Without surface flood water infiltrating the water table, the water table beneath ITN Lot 11 – 17 would not rise.

80. On October 5, 2009, the Village Board of Trustees voted to allow the engineering firm to do hydraulic modeling additional work to evaluate the benefit of the additional dam spillway.

**FRAUDULENT CONCEALMENT OF VILLAGE NON-COMPLIANCE WITH APPLICABLE FEMA NFIP DEVELOPMENT REGULATATORY STATUTES**

81. On October 12, 2009, plaintiff DAWN BILLIE (Dawn) wrote and mailed a letter to defendant Cook in his official capacity. The letter sought compensation by

Village buyout of her ITN Lot 16 house because of recurrent basement flooding on the generalized ground that the Village had allowed and approved the construction of the Lot 16 house with a basement floor elevation below the five hundred twenty four (524) feet BFE.

82. Dawn wrote to Cook because he occupied a position of trust as the elected Village municipal government leader whose primary function was to serve the Village residents and do so honestly and fairly.

83. Cook in reply sent an email on October 19, 2009 to Dawn, with a cc of this email to defendants Bowden, Silverman and Dolezal. Silverman, Bowden and Dolezal knew the content of the Cook's email before it was sent.

84. In this email, Cook began with the false statement:

> "I asked my staff at the Village to investigate the issues involving yours and others basement flooding. The results of that investigation has not shown that a single state or village regulation was broken, bent, or overlooked in the approval of any of the homes in question."

85. Cook knew what he wrote to Dawn was false as no "investigation" had occurred and that the Village's own Ordinance 703 reflected knowledge of and the need for compliance with "the rules and regulations of the National Flood Insurance Program codified at 44 CFR 59-79, as amended." Cook also knew Pahnke had violated FEMA's participating community, "Criteria for Land Use and Management, 44 C.F.R. § 60.3 after learning in May 2009 what the engineering firm had found during the drainage investigation before their written report became public.

86. By mention of only "state or village regulation" Cook concealed the applicable federal NFIP "participating community" regulations source from which wrongful non-compliance could be evaluated as a legally actionable reason for the ITN Lot 16 constructed house and the other plaintiff's houses with a basement floor elevation below the five hundred twenty four (524) feet BFE.

87. In this email, Cook made the second false statement:

> "Also in my looking at the issues involving Indian Trails, I have found where the property in question was removed from the "Special Flood Hazard Area" (SFHA) by the Illinois Department of Natural Resources (IDNR). This specifically removed the property or construction on the property from any state regulations involving "Floodplain Development." To the best of my knowledge the Village of Channahon's Floodplain Development Regulations at the time were that of the State of Illinois."

88. Cook knew what he wrote to Dawn was also false as the Village by its retained engineer and not the IDNR sought a FEMA Letter of Map Revision (LOMR) granted in July 1995 to remove 11 lots either fully or partially from the Indian Trails North Unit 2 and 3 subdivisions SFHA and 13 lots partially from the Unit 4 subdivision SFHA. These requests however had nothing to do with ITN Lots 11-17 and did not alter the earlier ITN Lots 11-17 SFHA Zone A or AO and Zone B designations. Also, Cook knew that FEMA's "Criteria for Land Use and Management, 44 C.F.R. § 60.3, as the federal minimum governing regulation, controlled the ITN Lots 11-17 developmental evaluation and the permitted construction process since the Village was an NFIP participating community.

89. Cook then chastised Dawn in this email with scornful sarcasm, using his false statements as the basis, to redirect her pursuit of compensation away from the Village and toward the IDNR with the following:

> "Knowing as I am sure you have found in your investigation that it was a state agency that said your property was no longer in the SFHA and they decided your property did not require Floodplain Development regulatory oversight. Why is it that you feel the Village of Channahon is to blame for you[sic] basement flooding, and why is there an unwillingness to hold the state agency that regulates these issues accountable or at least publicly ask for relief from them as you have the Village?

90. When Dawn read Cook's October 19, 2009 email reply she did not know, nor the other ITN Lot 11-17 plaintiffs know Cook's statements in this email were false. Dawn accepted Cook's statements made in his official capacity as true, as did the other plaintiffs. The Village Board of Trustees' earlier October 5, 2009 vote to approve the engineering firm's additional hydraulic modeling work in collaboration with the IDNR for the additional Channahon Dam spillway reinforced the false perception which Cook created of the IDNR and not the Village as the wrongdoer.

91. Bowden, Silverman and Dolezal received Cook's October 19, 2009 reply email to Dawn and after reading it, did nothing to correct Cook's email statements to Dawn which they also knew were false.

92. Cook's use of false statements and the scornful, sarcastic question to Dawn concealed the truth of federal regulatory non-compliance which occurred during the ITN Lots 11-17 development evaluation and permitted construction to hide each ITN Lot 11 –

17 household's right of action for compensation arising from flood prone houses.

93. Cook's use of false statements and scornful, sarcastic question to Dawn also succeeded in re-directing the ITN Lot 11-17 households' attention to the IDNR, falsely implied by Cook as the wrongdoer, for relief so that that each plaintiff's claims would not be discovered or whatever applicable limitations period would run out if such claims were discovered.

94. Cook's misdirection worked as intended. Plaintiff Donna Sabo (Donna) in April 2010 received an IDNR referral to a mitigation program coordinator from the IDNR Office of Water (OWR) resources to present the ITN Lot 11-17 household history of basement flooding and basement floor construction below the BFE so that grant based flood damages compensation could be obtained.

95. By July 2010, Donna learned of the lacking cost versus benefit to justify FEMA assistance for basement flooding through IDNR-OWR. Donna also learned of the chance, though unlikely, for an Illinois Department of Commerce and Economic Opportunity (DCEO) grant for flood mitigation. The IDNR-OWR mitigation program coordinator advised Donna to seek a DCEO grant through the Will County government.

96. In early August 2012, Donna learned about federal 2008 Hurricane Ike DCEO administered flooding disaster area grants and of unincorporated Will County flood damaged home buyouts with these grants from her Will County Board regional member. However, the Village had to apply for such grants to cover flood damaged

houses located within its boundaries and the Village had not done so.

97. Later in August 2012, Donna contacted Cook for the status of IDNR's Channahon Dam improvements project. In an August 22, 2012 reply letter to Donna, Cook reinforced his prior misrepresentation of IDNR's culpability first by reference to the Village's previous engineering study mischaracterized with the singular phrasing, "to determine the cause and the feasibility of mitigating the problem," and that the IDNR dam improvements would 'increase the level of protection for the study area basements.'

98. Cook also informed Donna in this letter that the Village's construction permit to the IDNR for the dam improvements had expired but the Village had been in contact with the IDNR and would reissue the permit without delay on the IDNR's request.

99. On April 19, 2013, sustained heavy rain caused the DuPage River to flood, with water height of over eleven (11) feet, and flowed rapidly over the Channahon Dam to cause dangerous dam erosion and the precautionary evacuation of nearby houses.

100. On April 19, 2013, the ITN Lot 11 – 17 households experienced further basement flooding. The Lot 11, 12, 15 and 16 house basement flooding approached or exceeded three feet deep.

101. On April 20, 2013, Lot 13 plaintiffs TODD STONITSCH, REBECCA STONITSCH and their children suffered carbon monoxide poisoning from the exhaust fumes collected in their house from continuously running, gasoline powered water

pumps set outdoors, causing all to be taken by ambulance for treatment at a Joliet hospital.

102. After the water subsided, the IDNR made emergent repair of the erosion damage with rip rap rock. The ITN Lot 11-17 households learned of the erosion damage to the Channahon Dam.

103. The plaintiffs believed the urgent need for permanent dam repair would spur the IDNR to finalize the fourth spillway design and begin this permitted improvement construction and repair work to finally bring the flooding relief which Cook predicted would occur.

104. The April 19, 2013 flood along the DuPage River had been widespread, with extensive damage in twenty (20) communities, which caused the DuPage County Stormwater Management Commission and Will County Executive Office to contact the United States Army Corps of Engineers (USACE) about performing a study of flooding issues along the DuPage River.

105. On July 14, 2015, the USACE signed a Feasibility Cost Share Agreement with the DuPage County Stormwater Management Commission, of which the Village by Dolezal was representative, and the Will County Executive Office for a study of flooding issues along the DuPage River (Study).

106. With this event, ITN Lot 11-17 households believed the IDNR would be a necessary participant in the USACE's Study, with the Channahon Dam's upstream effect

on water height and the IDNR dam improvements included in this Study and among the flood mitigation solutions found.

107. On November 18, 2015, plaintiffs Craig Billie, Dawn, Donna, Gerard Sabo, Andrew Kittl, Sharon Kittl, and Todd Stonitsch attended an USACE informational meeting about the Study in Shorewood. Dolezal also attended this meeting. Donna learned from the USACE colonel who conducted the meeting, that if the river water height could be linked to the ITN Lot 11-17 basement flooding by evidence, then the flood prone ITN area could be added to the Study. Afterward, Donna emailed a copy of the engineering firm's 2009 written report to the USACE because Village had not provided it.

108. Shortly after this meeting, Dawn and Donna sent emails to the other ITN Lot 11-17 households with the USACE Comment Form to relay meeting instructions to fill out the Comment form with each household's basement flooding history and return it to the USACE.

109. The USACE's Study did include an evaluation of the slurry wall flood protection concept for the ITN area, which included the Lot 11-17 households. Dolezal knew the slurry wall was under Study consideration but did not inform the ITN Lot 11 – 17 households.

110. The USACE on April 4, 2016 sent a Study status email, received by some of the ITN 11-17 households, which reported the evaluation of submitted written comments

received and a website link for access to Study "Frequently Asked Questions" and "Scoping Summary Report."

111. On May 1, 2017, sustained heavy rain caused the DuPage River to flood. The ITN Lot 11 – 17 households experienced further basement flooding. The Lot 11, 12, 15, and 16 house basement flooding approached or exceeded one foot deep.

112. On May 1, 2017, Dawn sent an email to Defendant Schumacher in her official capacity and position of trust as the Village President succeeding Cook, to report the Lot 16 house basement flooding with a description of what it took to combat the flooding. Dawn expressed the hope that Schumacher has been in contact with USACE and other government officials to finally resolve the recurrent flooding and Dawn's displeasure with IDNR and USACE for their delay in the recurrent flooding solutions.

113. Later, on May 1, 2017, Schumacher sent Dawn a reply email of a shared flooding concern, with attached photos of nearby lake water on Schumacher's driveway, in her garage, and yard. Schumacher deflected Dawn's reported flooding as "the inherent risks of living so close to water.", though ITN Lot 16 is about three hundred yards away from the DuPage River. Schumacher misleadingly concluded her reply with the non-committal, "we will continue to look for and pursue viable remedies." which the Village was not doing nor done after the engineering firm's investigation work concluded in December 2009.

114. On May 3, 2017, Dawn replied to Schumacher's May 1st email reply. Dawn

pointed out that Schumacher was the elected voice, "to the government entities that actually have decision making power on how to address the flooding issues along the DuPage River." Dawn also wrote, "I am hoping that the leadership of our Village -- you, your staff, and the entire Board of Trustees will find this an important issue to put some pressure on the government agencies that have the power to offer solutions to what we feel is a pretty serious problem." Dawn also informed Schumacher of the three (300) hundred yard distance of Lot 16 from the DuPage River and Schumacher's residence beside a lake.

115. On May 25, 2017, the USACE sent a Study status email with a newsletter attachment about the recent flood with a peak water height seen on May 1st and providing the Study process next steps. The newsletter attachment reported continued evaluation of the potential flood management watershed projects identified and the anticipated Spring 2018 release of a Study draft report for public review.

116. On October 16, 2017, the ITN Lot 11 – 17 households experienced further basement flooding. The Lot 12 and 16 house basement flooding approached one foot deep.

117. After the May 1 - 3, 2017 email exchange between Dawn and Schumacher, the ITN Lot 11 – 17 households did not receive any indication from the Village leadership of advocacy nor pressure on their behalf directed toward the IDNR, FEMA and the USACE for solution(s) to their recurrent basement flooding. The Village had not

proposed nor pursued any remedies either.,

118. On February 22, 2018, the ITN Lot 11 – 17 households experienced further basement flooding. The Lot 12, 15, and 16 house basement flooding approached or exceeded one foot deep.

119. On February 22, 2018, Dawn sent an email to Schumacher in her official capacity to again report the Lot 16 house basement flooding to Village leadership, then three times in the last nine months. Dawn also expressed her belief to Schumacher, having recognized then that Cook's 2009 IDNR wrongdoer identification was probably dishonest, that the Village had been solely at fault for the ITN Lot 11 – 17 households' recurrent basement flooding.

120. Later on February 22, 2018, Schumacher sent a reply email to Dawn which falsely represented the Village had "followed engineering standards" to have Dawn again think the Village had no fault when approving the construction and occupancy of the ITN Lot 11 – 17 houses. Schumacher again deflected Dawn's reported recurrent flooding as "the inherent risks of living so close to water," despite being informed the year before that Lot 16 is nowhere close to the DuPage River.

121. Later February 22, 2018, Dawn forwarded her earlier email exchange with Schumacher to defendant Slocum so that a Village trustee became personally aware of what Schumacher had dishonestly written and which falsely blamed the ITN Lot 11 – 17 households for "living so close to the water."

**DENIAL OF COMPENSATION**

122. On and after October 12, 2009 to present day, each plaintiff has been denied compensation by property buyout or otherwise.

123. On April 30, 2019, the ITN Lot 11 – 17 households experienced further basement flooding. The Lot 12, 15, and 16 house basement flooding approached one and one-half feet deep.

124. Beginning in May 2019, Dawn began to research what standards governed the ITN Lot 11 – 17 development and approval of Lot 11 – 17 improvements, with FOIA document requests to the Village.

125. On July 31, 2019, the USACE released the Study draft report. The slurry wall project for the Indian Trail Development, including the ITN Lot 11 – 17 households, did not meet the USACE cost benefit criteria and will not be built.

126. In September 2019, Dawn located a FEMA publication as a guide for local government in their flood management programs. This Guide included and explained how to apply FEMA's "Criteria for Land Use and Management, 44 C.F.R. § 60.3.

127. On January 6, 2020, Dawn presented at a Village Board Meeting to Schumacher, Greco, Host, McMillin, Perinar, Scaggs, and Slocum, with Dolezal, Durkin, and Silverman also present, how the ITN Lots 11-17 developmental evaluation and permitted construction process wrongfully violated applicable flood management criteria regulation to cause each household's recurrent basement flooding.

128. Dolezal in providing a requested chronology of events immediately after Dawn's presentation, acknowledged rising surface flood water, through the highly porous soil, inundates the ground around the ITN Lot 11 – 17 household basements to cause each household's recurrent basement flooding. Dolezal however falsely denied the Village violated any NFIP regulation nor the Village's own 703 Ordinance and that Silverman had looked at this issue.

129. On January 27, 2020, Craig and Dawn had an afternoon Village hall meeting with Dolezal and Durkin. In this meeting, Craig and Dawn made an ITN Lot 16 buyout request to the Village. By inaction and silence since then, the Village has denied this buyout request, necessitating this action for redress.

130. On May 18, 2020, the ITN Lot 11 – 17 households experienced further basement flooding. The Lot 12 and 16 house basement flooding approached one foot. The Lot 11 and 15 house basements had almost two feet.

## COUNT I
## 42 U.S.C. § 1983 (MONELL CLAIM – POLICY, PRACTICE, AND/OR CUSTOM)
## DEFENDANT VILLAGE OF CHANNAHON

131. The plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

132. The actions of each individual defendant were done pursuant to one or more of the following *de facto* policies, practices and/or customs of the Village that are so pervasive to carry the force of law.

133. The Village has a *de facto* policy, practice and/or custom of concealing and/or suppressing the disclosure of misconduct or reckless, indifferent wrongdoing by elected representatives and/or employed staff by use of false statements or fraudulent misrepresentation and/or omission.

134. The Village has a *de facto* policy, practice and/or custom of avoiding investigation or conducting sham investigation of indicated misconduct or reckless, indifferent wrongdoing of its elected representatives and/or employed staff.

135. The Village has a *de facto* policy, practice and/or custom of failing to obtain and/or maintain complete records of permitted development and completed construction and/or accepting untimely, falsified or materially incomplete record submittals.

136. The Village acted in a manner consistent with a *de facto* policy, practice and/or custom by various false statements, fraudulent misrepresentation and omission to conceal the Village's regulatory misconduct connected to ITN Lot 11 – 17 recurrent basement flooding and in the misleading representation of the IDNR as the sole wrongdoer and not the Village to deceive and mis-direct the plaintiffs so that the plaintiffs would not discover a right of action or applicable limitations and repose periods would fortuitously expire.

137. The Village acted in a manner consistent with a *de facto* policy, practice and/or custom by withholding inculpatory, material information and subsequently impeding written information requests by denial, claim of no records or incomplete

disclosure after May 14, 2019 for documents concerning ITN Lot 11 – 17 development and permitted construction completed.

138. This official cover-up was rooted in a concerted and unremitting abuse of power and authority, and it was undertaken, with the intent or knowledge that it would obstruct the legitimate efforts of the plaintiffs to obtain just compensation through judicial redress, or with reckless, indifferent disregard for the same.

139. In doing so, the Village denied each plaintiff just compensation for the recurrent basement flooding taking of ITN Lot 11 – 17 for public flood water storage, in violation of each plaintiff's right under the Fifth and Fourteenth Amendments to the Constitution of the United States and in statutory violation of the NFIP FEMA "Criteria for Land Use and Management, 44 C.F.R. § 60.3(a)(3) which resulted in each plaintiff's houses constructed and approved for occupancy that are not reasonably safe from flooding.

140. Each plaintiff seeks just compensation determined by the finder of fact against the Village of Channahon and an award by the court of reasonable attorneys' fees, costs, and litigation expenses as the prevailing parties.

## COUNT II
## 42 U.S.C. § 1983 - JUST COMPENSATION CONSTITUTIONAL DEPRIVATON ALL INDIVIDUAL DEFENDANTS

141. The plaintiffs incorporate preceding paragraphs 1. through 130 as though fully set forth herein.

142. All individual defendants knew or reasonably should have known of a private land owner's Fifth Amendment constitutional right to just compensation when government regulatory action results in a taking, such as public flood water invasion of private land to cause the direct and immediate interference with the owner's enjoyment and use of the land.

143. All individual defendants either knew around the time of or came to learn later upon first performing official duties of the ITN Lot 11-17 takings from one or more plaintiff's report of recurrent basement flooding events occurring on and after September 15, 2008.

144. All individual defendants in concert among themselves, acting under color of law, attempted to cover-up and/or suppress the wrongfully caused ITN Lot 11-17 takings by recurrent basement flooding to deprive each plaintiff's judicial right of redress to obtain just compensation.

145. All individual defendants in concert among themselves, acting under color of law have caused or contributed to cause the deprivation of each plaintiff's constitutional right of just compensation for the recurrent basement flooding takings which have occurred.

146. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, or with reckless indifference to the rights of each plaintiff conferred under the Fifth and Fourteenth Amendments to the Constitution

of the United States, and in total disregard of the truth.

147. Each plaintiff seeks just compensation determined by the finder of fact against each individually named defendant and an award by the court of reasonable attorneys' fees, costs, and litigation expenses as the prevailing parties.

**COUNT III**
**42 U.S.C. § 1983 – STATUTORY RIGHT DEPRIVATON**
**All DEFENDANTS**

148. Plaintiffs incorporate preceding paragraphs 1. through 130 as though fully set forth herein.

149. All individual defendants in their various official capacities serving a riverine, NFIP participating community knew or reasonably should have known that the NFIP FEMA "Criteria for Land Use and Management, 44 C.F.R. § 60.3 regulatory scheme had the purpose, among others, to protect foreseeable persons' life, health and their newly constructed residential dwellings allowed in flood prone, land areas, such as each plaintiff, who would reside in each such dwelling.

150. All individual defendants either knew around the time of or came to learn later of the ITN Lot 11-17 recurrent house basement flooding events on and after September 15, 2008 which continue to present day.

151. All individual defendants knew of the NFIP FEMA "Criteria for Land Use and Management, 44 C.F.R. § 60.3 violations which had occurred in the development of ITN Lot 11 – 17 and resulted in each constructed hazardous, flood prone house which

proximately caused and continue to cause injurious harm to each plaintiff's physical and mental health and further suffer various economic losses.

152. All individual defendants in concert among themselves, acting under color of law, attempted to cover-up and/or suppress the wrongful, NFIP FEMA "Criteria for Land Use and Management, 44 C.F.R. § 60.3 violations to deprive each plaintiff's right of judicial redress to obtain money damages compensation for their personal injuries and the economic losses to their respective residential properties and out of pocket.

153. All individual defendants in concert among themselves, acting under color of law have either directly caused the federal statutory violations or subsequently contributed to deprive each plaintiff the statutory protection of life, health, and property reasonably safe from flooding.

154. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, or with reckless indifference to the statutory rights conferred to foreseeable persons provided by the NFIP FEMA "Criteria for Land Use and Management, 44 C.F.R. § 60.3 regulatory scheme, and in total disregard of the truth.

155. Each plaintiff seeks money damages compensation determined by the finder of fact against each individually named defendant and an award by the court of reasonable attorneys' fees, costs, and litigation expenses as the prevailing parties.

**COUNT IV**
**STATE CLAIM – INVERSE CONDEMNATION**
**DEFNDANT VILLAGE OF CHANNAHON**

156. The plaintiffs incorporate preceding paragraphs 1. through 130 as though fully set forth herein.

157. The Village, at no time, has initiated an action for condemnation of ITN Lot 11 - 17.

158. The Village's regulatory efforts in the development of ITN Lot 11 – 17 and the permitted construction of hazardous, flood prone houses proximately caused a taking of each lot by private storage of the accumulated public flood water during each recurrent house basement flooding event.

159. Each plaintiff has been deprived the beneficial economic use of their entire respective residence because the basement of each house cannot be used as a finished living area nor a secure, storage area nor a reasonably safe place for location of HVAC and hot water heating mechanical equipment and electrical power supply components.

160. Theses recurrent takings have also diminished the market value and made questionable each plaintiff's ability to resell their house. Any house listing for sale will require the statutory written disclosure of the extensive recurrent flooding history and highly probable future flooding, in accordance with Illinois Residential Real Property Disclosure Act, 765 Ill. Comp. Stat. 77/35

161. Each plaintiff seeks just compensation determined by the finder of fact

against the Village and an award by the court of reasonable attorneys' fees, costs, and litigation expenses as the prevailing parties (735 Ill. Comp. Stat. 30/10-5-115).

Respectfully submitted,

/s/ _Steven C. Fuoco_

Steven C. Fuoco (ARDC 6206935)
Fuoco Law Group, Ltd
1055 Golf Avenue
Highland Park, Il 60035-3637
847/432-LAWS (5297)
fuocolawgroup@gmail.com
Counsel for Plaintiffs