IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CRAIG BILLIE, *et al*,<br><br>Plaintiffs,<br><br>v.<br><br>VILLAGE OF CHANNAHON, *et al*,<br><br>Defendants. | Case No. 20-cv-3294<br><br>Judge Mary M. Rowland |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Craig Billie, Dawn Billie, Sara DeLucio, Janet Hopman, Andrew Kittl, Sharon Kittl, Donald Mladic, Susan Mladic, Gerard Sabo, Donna Sabo, Todd Stonitsch, and Rebecca Stonitsch allege the Village of Channahon ("the Village"), as well as several of its Trustees and employees (James Bowden, Wayne Chesson, Joseph Cook, Jr., Edward Dolezal, Thomas Durkin, Samuel Greco, Chantal Host, Scott McMillian, Thomas Pahnke,[1] Patricia Perinar, Mark Scaggs, Janet Schumacher, David Silverman, and Scott Slocum, Jr., together "the individual Defendants") violated their federal constitutional and statutory rights under the Takings Clause of the Fifth Amendment, the National Flood Insurance Act of 1968 ("NFIA"), 42 U.S.C. § 4001 *et seq.*, and the Flood Disaster Protection Act of 1973 ("FDPA"), 42 U.S.C. § 4002. Count I is a *Monell* claim brought pursuant to 42 U.S.C.

---

[1] On April 19, 2021 the Court granted the Defendants leave to substitute a party for Thomas Pahnke, recently deceased. (Dkt. 59). Plaintiffs have filed a Second Amended Complaint naming the administrator of Pahnke's estate, Jeffrey D. Corso, as a Defendant. (Dkt. 60). For the sake of clarity, the Court will continue to refer to Pahnke in this order.

1

§ 1983 alleging that the Village had a policy or practice of violating the federal statutory rights and the Fifth Amendment rights of the Plaintiffs. Count II and III, brought under § 1983, assert that the individual Defendants deprived Plaintiffs of their Fifth Amendment rights to compensation for a taking and deprived the Plaintiffs of federal statutory rights, respectively. Plaintiffs also raise state law claims of inverse condemnation (Count IV), nuisance (Count V), and trespass (Count VI) against the Village. Finally, Plaintiffs bring a claim for deprivation of the right of access to the courts against all Defendants pursuant to § 1983 (Count VII). For the reasons stated herein, Defendant's motion to dismiss (Dkt. 41) is granted.

## I. Background

The following factual allegations are taken from the corrected Amended Complaint (Dkt. 35) and are accepted as true for purposes of this motion to dismiss. *See W. Bend Mut. Ins. Co. v. Schumacher*, 844 F.3d 670, 675 (7th Cir. 2016). Plaintiffs own homes in a Channahon, Illinois subdivision called Indian Trails North. Plaintiffs' homes are located in or around the FEMA-designated DuPage River Special Flood Hazard Area ("SFHA").[2] When the water table around the DuPage River rises, their basements are flooded with water for several reasons. First, the basements were constructed at a depth of between 518 and 520 feet above the National Geodetic Vertical Datum (a standardized measure of elevation based on sea level) in an area where the base flood elevation is only 524 feet and the water table is only eight to ten

---

[2] The Amended Complaint states that "Lots 13 through 21 were within the SFHA." (Dkt. 35, ¶ 58). This means that the lots belonging to Donald Mladic and Susan Mladic (Lot 11), as well as the lot belonging to Gerard Sabo and Donna Sabo (Lot 12) are outside of the SFHA. *Id*.

feet below ground. Second, the Channahon Dam impedes the flow of the river. And third, the soil is porous. The Plaintiffs' basements flooded in 1996, 2001, 2007, twice in 2008, 2009, 2013, 2017, and 2020.

**A. Relevant Statutes**

Plaintiffs invoke various statutes as the bases for their claims. The National Flood Insurance Act of 1968 ("NFIA") codified at 42 U.S.C. § 4001 *et seq.* created a national flood insurance program and empowered a Federal Insurance Adjuster to enact regulations that would reduce future losses to flood damage. At all times relevant to this case the Village participated in the National Flood Insurance Program.

Congress later passed the Flood Disaster Protection Act of 1973 ("FDPA") codified at 42 U.S.C. § 4002, which required "[s]tates or local communities, as a condition of future Federal financial assistance, to participate in the flood insurance program and to adopt adequate flood plan ordinances with effective enforcement provisions consistent with Federal standards to reduce or avoid future flood losses." § 4002(b)(3). These "adequate ordinances" would require that participating municipalities "[r]eview all permit applications to determine whether proposed building sites will be reasonably safe from flooding" and require certain construction standards in flood-prone areas, 44 C.F.R. § 60.3(a)(3) 51 Fed. Reg. 30,307 (Aug. 25, 1986), "[o]btain the elevation (in relation to mean sea level) of the lowest floor (including basement) of all new and substantially improved structures" in areas designated as flood-prone by the federal government, and "[m]aintain a record of all

3

such information with the official designated by the community." 44 C.F.R. § 60.3(b)(5) 51 Fed. Reg. 30,307 (Aug. 25, 1986). Participating municipalities also had to require that any construction in flood-prone areas be above certain depths, 44 C.F.R. § 60.3(c)(7), and prohibit new construction in some flood-prone areas without hydrologic studies. 44 C.F.R. § 60.3(d)(3).

On April 6, 1992, the Village Board of Trustees passed Ordinance 703, requiring that the Village "comply with the rules and regulations of the National Flood Insurance Program codified at 44 CFR 59-79, as amended." Defendant Thomas Pahnke, the Building and Zoning Officer, was tasked with enforcing this ordinance. He was required to "[e]nsure that all development activities within the [flood-prone areas] of the jurisdiction of the Village meet the requirements of this Ordinance" and "[i]nspect all development projects before, during and after construction to assure proper elevation of the structure and to ensure they comply with the provisions of this Ordinance." Ordinance 703, § 505.0–506.0.

**B. Chronology of Events**

On September 29, 1992, the Village Board of Trustees voted to approve construction of the Indian Trails North subdivision.[3] A few months later Village Attorney Silverman either drafted or approved an agreement annexing the subdivision to the Village, and on November 16, 1992 that annexation was approved by the Board. Between September of 1993 and August of 1994 building permit applications were filed for each of the Plaintiffs' homes. Defendants Pahnke and

---

[3] The Complaint does not indicate which Defendants constituted the Board at this time.

4

Silverman, the Building and Zoning Officer and the Village Attorney, reviewed these applications. They did not require any hydrological analyses, any special inspection, permitting, or certification for construction in flood-prone areas, and Plaintiffs assert that their actions were not in compliance with the federal regulations that Ordinance 703 was designed to implement. Each of the Plaintiffs (or their predecessors in interest) were granted a building permit.

In 1996, the basements at Indian Trails flooded for the first time. Former Village President Chesson, Trustee Greco, and several FEMA representatives visited the subdivision to view the damage. The Amended Complaint alleges that during conversations with these FEMA representatives Chesson and Greco "came to believe [. . .] the basement floor elevations may have been too deep." (Dkt. 35 at ¶ 76).

In March of 1998, the Village asked FEMA to remove several empty Indian Trails lots from the SFHA so that they could be developed.[4] Village President Chesson received a response from FEMA on March 29, 1998. It partially approved the Village's request, removing certain empty lots from the SFHA. The letter also noted that construction on those empty lots "remain[ed] subject to Federal, State, and local regulations for floodplain management." (*Id*. at ¶ 79). FEMA "encourage[d]" the Village to "require that the lowest adjacent grade and lowest floor (including basement / crawl space) elevations of any structure placed on [the empty lots that had been removed from the SFHA] be elevated to a level at or above the base flood elevation of 525.5 feet." (*Id*. at ¶ 79). FEMA also denied the Village's request in part,

---

[4] These lots do not belong to the Plaintiffs.

keeping some empty lots in the SFHA. Plaintiffs allege that this letter caused former Village President Chesson, Attorney Silverman, Village Administrator Bowden, Trustee Greco, Building and Zoning Officer Pahnke, and Director of Public Works Dolezal to "kn[ow] [. . .] that Lot 11–17 basement floor elevations were too deep and violated Ordinance 703 and 44 C.F.R. §§ 59.1–60.26." (*Id*. at ¶ 82). Plaintiffs also allege that these Defendants therefore knew that the Plaintiffs' homes "would continue without end to have basement flooding." (*Id*. at ¶ 83). Plaintiffs assert that despite this knowledge Defendants engaged in a "conspiracy of silence" and failed to alert Plaintiffs or their predecessors in interest of the danger of continued flooding. (*Id*. at ¶ 84). Various other Defendants not then in office, including Trustee McMillian, Trustee Slocum, former Village President Cook, Village President Schumacher, Trustee Host, Trustee Perinar, Trustee Scaggs, and Village Administrator Durkin are also alleged to have participated in this conspiracy of silence after learning of the ongoing danger of flooding.

After experiencing flooding in 2001, 2007, and 2008 Indian Trails residents asked the Village to investigate the problem. The Village hired an engineering firm "to determine the causes for significant basement flooding" and "propose potential solutions." (*Id*. at ¶ 96). The resulting report was received by then-Village President Cook and Director of Public Works Dolezal in 2009. It noted that a combination of factors including the low elevations of the basements, downstream impediments to water flow at the Channahon Dam,[5] and porous soil were responsible for the flooding.

---

[5] This is apparently a pre-existing structure operated by the Illinois Department of Natural Resources.

6

The report did not investigate the permitting process or the conduct of any Village officials. It recommended that the Village work with the Illinois Department of Natural Resources ("IDNR") to divert water from the Dam, and that the Village construct a concrete barrier to stop surface runoff from reaching the water table. On October 5, 2009 the Board voted to have the engineering firm create a hydraulic model of these proposed solutions.

On October 9, 2009, Plaintiff Dawn Billie wrote to then-Village President Cook asking that the Village buy Dawn and Craig Billie's home, on the grounds that it had approved construction of a basement that was deeper than 524 feet base flood elevation. President Cook replied, copying Attorney Silverman (who may also have reviewed or revised the email), Village Administrator Bowden, and Director of Public Works Dolezal. Cook stated he had "asked [his] staff to investigate" the flooding, and that this investigation had "not shown that a single state or village regulation was broken, bent, or overlooked in the approval of any of the homes in question." (*Id.* at ¶ 110). It also stated that the Billies' lot had been "removed from the 'Special Flood Hazard Area' (SFHA) by the Illinois Department of Natural Resources" and that therefore the property had not been subject to "any state regulations involving 'Floodplain Development.'" (*Id.* at ¶ 113). President Cook's reply finally noted that to the best of his knowledge the lot had only been subject to state regulations at the time of construction. Plaintiffs allege these three assertions were fraudulent.

In 2012, Plaintiff Donna Sabo contacted President Cook to inquire about the status of the proposed Channahon Dam project. Cook responded that this project, a

7

collaboration with the IDNR, would "increase the level of protection for the study area basements." (*Id.* at ¶ 123). He also stated that the purpose of the 2009 engineer's report had been to "determine the cause and the feasibility of mitigating the problem." *Id.* According to Cook's letter the Village had granted permits to the IDNR for the construction of dam improvements, but that the IDNR had not made any improvements and the permits had lapsed. Cook said the Village would reissue them "without delay" upon the IDNR's request. (*Id.* at ¶ 124).

After more flooding in 2013, the county government and the Army Corps of Engineers did their own study of flooding along the DuPage River. In 2015, various Plaintiffs and Director of Public Works Dolezal attended a public meeting held by the Army Corps of Engineers. Plaintiffs' homes were included in the Army Corps of Engineers study after Plaintiff Donna Sabo provided proof of flooding and a copy of the 2009 report commissioned by the Village.

In 2017, the Plaintiffs' basements flooded once again. Plaintiff Dawn Billie wrote to newly elected Village President Schumacher to complain that the Army Corps of Engineers and the County had not made progress after their study, and that the IDNR had not made any modifications to the Dam. President Schumacher, whose own property had flooded, commiserated that this was "the inherent risk of living so close to water," a statement that the Plaintiffs characterize as false and deceptive. (*Id.* at ¶ 139). She also said: "we will continue to look for and pursue viable remedies." *Id.* The Plaintiffs assert this statement was false because President Schumacher "knew there were no [. . .] basement flooding solutions or remedies." *Id.*

8

In 2018, Plaintiff Dawn Billie emailed President Schumacher again, blaming the Village for another bout of flooding. President Schumacher reiterated that the Village had "followed engineering standards" and that flooding was one of the "inherent risks of living so close to water." (*Id.* at ¶ 1246). Billie forwarded this correspondence to Trustee Slocum.

In 2019, the Army Corps of Engineers released the results of its multi-year study, concluding that it would not build the proposed concrete barrier to protect the Indian Trails subdivision because it did not meet certain cost-benefit requirements.

In 2020, Plaintiff Dawn Billie attended a Village Board of Trustees meeting attended by President Schumacher, Trustee Greco, Trustee Host, Trustee McMillian, Trustee Perinar, Trustee Scaggs, and Trustee Slocum, Director of Public Works Dolezal, Village Administrator Durkin, and Attorney Silverman. At that meeting Billie asserted that the Village had failed to comply with 44. C.F.R. § 60.3 when it permitted the construction of the Plaintiffs' homes. Director Dolezal also spoke at this meeting, acknowledging that the flooding was caused by the rising water table and porous soil, but denying that the Village had violated Ordinance 703 or any federal regulation, and asserting that Attorney Silverman had rendered the same judgment.

After a final buyout request was made and denied in 2020, the Plaintiffs brought suit against the Village and the individual Defendants.

## II. Standard

A motion to dismiss tests the sufficiency of a complaint, not the merits of the case. *See Gibson v. City of Chi.,* 910 F.2d 1510, 1520 (7th Cir. 1990). "To survive a

motion to dismiss under Rule 12(b)(6), the complaint must provide enough factual information to state a claim to relief that is plausible on its face and raise a right to relief above the speculative level." *Haywood v. Massage Envy Franchising, LLC*, 887 F.3d 329, 333 (7th Cir. 2018) (quotations and citation omitted). *See also* Fed. R. Civ. P. 8(a)(2) (requiring a complaint to contain a "short and plain statement of the claim showing that the pleader is entitled to relief."). A court deciding a Rule 12(b)(6) motion accepts plaintiff's well-pleaded factual allegations as true and draws all permissible inferences in plaintiff's favor. *See Fortres Grand Corp. v. Warner Bros. Entm't Inc.,* 763 F.3d 696, 700 (7th Cir. 2014). A plaintiff need not plead "detailed factual allegations", but "still must provide more than mere labels and conclusions or a formulaic recitation of the elements of a cause of action for her complaint to be considered adequate under Federal Rule of Civil Procedure 8." *Bell v. City of Chi.*, 835 F.3d 736, 738 (7th Cir. 2016) (citation and internal quotation marks omitted).

Dismissal for failure to state a claim is proper "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558, 127 S. Ct. 1955, 1966 (2007). Deciding the plausibility of the claim is "'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *McCauley v. City of Chi.*, 671 F.3d 611, 616 (7th Cir. 2011) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 679, 129 S. Ct. 1937, 1950 (2009)).

### III. Analysis

**A. Federal Claims**

Plaintiffs bring four federal claims, each pursuant to 42 U.S.C. § 1983, alleging that the Defendants violated their federal statutory and constitutional rights while acting under color of law. *See Gonzaga Univ. v. Doe*, 536 U.S. 273, 279 (2002) ("§ 1983 actions may be brought against state actors to enforce rights created by federal statutes as well as by the Constitution."). Count I, the *Monell* claim, alleges the Village had a policy or practice of "den[ying] each plaintiff just compensation for the physical invasion" by flood water into their basements. (Dkt. 35 at ¶ 164). The Court understands this to be a Fifth Amendment claim.[6] Count I also asserts the Village had a policy or practice of "failing to obtain and/or maintain complete records." The Plaintiffs do not clearly state that this is a violation of a federal statutory right, but the Court understands this to be their contention because they also describe the Village *concealing* the violation of federal regulations.

Count II alleges that the individual Defendants deprived Plaintiffs of just compensation in violation of the Fifth Amendment, while Count III alleges that the individual defendants engaged in "federal statutory violations" by failing to comply with 44 C.F.R. §§ 59.1–60.26. Defendants make various arguments in favor of dismissal.

---

[6] The Defendants argued Count I may be a due process claim or an access to the courts claim. (Dkt. 51 at 1). Plaintiffs did not respond to the due process argument, so the Court considers any due process claim waived by the Plaintiffs. Plaintiffs made it clear in their response brief that Count I was not a "backwards looking denial of access claim." (Dkt. 49, 6).

11

### 1. *Counts I and III: Federal Statutory or Regulatory Claims*

Plaintiffs accuse Defendants of failing to comply with certain federal flood regulations and concealing violations of the Ordinance 703 and 44 C.F.R. §§ 59.1 – 60.26. (Dkt. 35, ¶¶ 160, 177, 179). Section 1983 is not a remedy for violations of state or local laws so Ordinance 703 cannot give rise to a federal cause of action. *See Scott v. Edinburg*, 346 F.3d 752, 760 (7th Cir. 2003). Plaintiffs can assert a violation of federal *statutory* rights under Section 1983. However, in order to state a claim upon which relief can be granted, a private right of action must have been created under the pertinent statute, here: the National Flood Insurance Act of 1968 ("NFIA"), 42 U.S.C. § 4001 *et seq.*, or the Flood Disaster Protection Act of 1973 ("FDPA"), 42 U.S.C. § 4002. *See Blessing v. Freestone*, 520 U.S. 329, 340 (1997) ("to seek redress through § 1983 [. . .] a plaintiff must assert the violation of a federal *right*, not merely a violation of federal *law*) (emphasis original).

Plaintiffs object that this inquiry is premature at the motion to dismiss stage but cite no case law supporting this argument. The Court disagrees. Whether a federal statute or regulation creates a right cognizable under § 1983 and therefore a cause of action is not an inquiry that fact discovery would shed any light on. It is "basically a matter of statutory construction." *Simpson v. Reynolds Metals Co.*, 629 F.2d 1226, 1238 (7th Cir. 1980) (citing *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11 (1979)). District courts frequently make such determinations when deciding motions to dismiss. *See, e.g., Shebley v. United Cont'l Holdings, Inc.*, 357 F. Supp. 3d 684, 690 (N.D. Ill. 2019) (finding no private right of action in § 40127(a) of

the ADA and granting motion to dismiss); *Bhattacharya v. Chicago Hous. Auth.*, No. 14 C 9693, 2017 WL 1197095, at *1 (N.D. Ill. Mar. 31, 2017) (determining whether § 1437a of the United States Housing Act created a private right of action at the motion to dismiss stage).

To determine whether a statute creates a private right of action, courts consider (i) whether the statute was enacted to benefit a special class to which the plaintiffs belong; (ii) the statute's legislative history; (iii) whether a private remedy should be implied as necessary or helpful to the accomplishment of the statutory purpose or should not be implied if doing so frustrates the underlying purpose for the legislative scheme; and (iv) whether the subject matter is principally a concern of the States.[7] *See Cannon v. University of Chicago*, 441 U.S. 677, 689 (1979) (citing *Cort v. Ash*, 422 U.S. 66, 78–85 (1975)). These are subjects upon which Congress and other courts have opined, and which the parties to this case have briefed, so they are ripe for this Court's consideration.

*i. Special class of plaintiffs*

The NFIA says that

> flood disasters have created personal hardships and economic distress which have required unforeseen disaster relief measures and have placed an increasing burden on *the Nation's* resources, [which necessitates] sharing the risk of flood losses [and eventually] making flood insurance coverage available on reasonable terms and conditions to *persons who have need for such protection*.

---

[7] Neither party addresses this fourth factor in their briefs, and the Court finds that in any case the first three factors are dispositive.

42 U.S.C.A. § 4001 (emphasis added). Plaintiffs do appear to be "persons in need of such protection," and were intended to benefit from this Act. However, the Act appears equally concerned with the resources of "the Nation" that were being spent on flood relief. Likewise, the FDPA states

> it is *in the public interest* for *persons already living in flood-prone areas* to have both an opportunity to purchase flood insurance and access to more adequate limits of coverage, so that they will be indemnified, for their losses in the event of future flood disasters.

42 U.S.C. § 4002 (emphasis added). Plaintiffs are persons living in flood-prone areas, but once again they are only singled out as a class of individuals who require insurance coverage to safeguard "the public interest." This language provides evidence that Congress intended to protect a special class of plaintiffs that includes the Plaintiffs, but no evidence that this protection would take the form of a private cause of action.

*ii. Legislative history*

Neither party directs the Court to any relevant legislative history. In *Mid-American National Bank of Chicago v. First Savings & Loan Ass'n of S. Holland*, the Seventh Circuit conducted "an analysis of the legislative history and purpose" of the NFIA and found "that the primary purpose behind the Flood Program was to diminish, by implementation of sound land use practices and flood insurance, the massive burden on the federal treasury of escalating federal flood disaster assistance." 737 F.2d 638, 642 (7th Cir. 1984). The court therefore declined to find that insured homeowners had an implied right of action against mortgage providers who had failed to inform them that the homes they were purchasing were in flood

plains and did not require them to purchase flood insurance. Although this case dealt with a different section of the NFIA its reasoning is instructive, as is the legislative history it cites. The *Mid-American* court quoted House Report No. 1585, which "addressed the purposes and objectives of the Flood Program" saying:

> Heavy losses over the years from hurricanes in the coastal areas and from storms in inland areas of the Nation dramatize the lack of insurance protection against flood damage. [. . .] Communities along the seacoast or in a river basin become completely immobilized following a major flood. Usually they must depend on the Federal Government and voluntary relief agencies to provide various forms of assistance. Some State and local governments have limited programs to assist a flood-stricken area, but disaster relief from all of these sources is inadequate to provide for the necessary restoration of heavily damaged areas. *These facts underline the need for a program which will make insurance against flood damage available, encourage persons to become aware of the risk of occupying the flood plains, and reduce the mounting Federal expenditures for disaster relief assistance.*

*Id*. at fn. 9, citing H.R.Rep. No. 1585, 90th Cong., 2d Sess., reprinted in [1968] U.S. Code Cong. & Ad. News 2873, 2966–2967 (emphasis added). This legislative history contains no language to suggest that Congress intended to create a private right of action for homeowners against municipal governments based on flooding.

*iii. Statutory purpose*

The stated purposes of the FDPA are to:

(1) substantially increase the limits of coverage authorized under the national flood insurance program; (2) provide for the expeditious identification of, and the dissemination of information concerning, flood-prone areas; (3) require States or local communities, as a condition of future Federal financial assistance, to participate in the flood insurance program and to adopt adequate flood plain ordinances with effective enforcement provisions consistent with Federal standards to reduce or avoid future flood losses; and (4) require the purchase of flood insurance by property owners who are being assisted by Federal programs or by federally supervised, regulated, or insured agencies or

15

institutions in the acquisition or improvement of land or facilities located or to be located in identified areas having special flood hazards.

42 U.S.C. § 4002. Similarly, the self-professed purpose of the NFIA was to

authorize a flood insurance program by means of which flood insurance, over a period of time, can be made available on a nationwide basis through the cooperative efforts of the Federal Government and the private insurance industry.

42 U.S.C.A. § 4001. Again there is nothing in these statements of purpose to suggest that Congress intended to create a private cause of action of the sort the Plaintiffs are advancing.[8] Moreover, the *regulations* Plaintiffs rely on are merely best practices for flood management that municipalities must implement in order to receive federal funds from the National Flood Insurance Program. Plaintiffs make no argument and cite no case law to support the notion that the CFR sections cited create a private right of action. *Cf., Alexander v. Sandoval*, 532 U.S. 275, 289 (2001) (when a statutory imperative is "phrased as a directive to federal agencies engaged in the distribution of public funds," [. . .] "[t]here [is] far less reason to infer a private remedy in favor of individual persons") (quotations and citations omitted).

To summarize, none of these factors suggest that the NFIA or the FDPA created a private right of action for homeowners against municipalities that fail to follow federal flood regulations. Plaintiffs attempt to distinguish the cases Defendants cite where courts have held that various statutes *did not* impliedly create

---

[8] *See Mid-American National Bank of Chicago v. First Savings & Loan Ass'n of S. Holland*, 737 F.2d 638, 642 (7th Cir. 1984) (citing 42 U.S.C. §§ 4053, 4072, and 4104(f), which allow flood insurance policyholders to sue insurers and homeowners to petition in federal court for a change in their flood-hazard zone for the proposition that when Congress intends to create a private cause of action under the NFIA and FDPA, it did so explicitly.).

private rights of action.⁹ But Plaintiffs cite to no cases in which a court has found that the FDPA or the NFIA impliedly created a private cause of action. More importantly, they can point to no part of these statutes *or* their legislative histories supporting the existence of such a right. Count III is dismissed with prejudice, and Count I is dismissed with prejudice to the extent that it alleges violations of the FDPA or the NFIA.

### *2. Counts I and II: Fifth Amendment Taking Claims*

The Takings Clause of the Fifth Amendment cautions that "private property [shall not] be taken for public use, without just compensation." U.S. Const. Amend. V. This clause is "designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Arkansas Game & Fish Comm'n v. United States*, 568 U.S. 23, 31 (2012). The Supreme Court acknowledges that certain government actions are always a taking, such as the "permanent physical occupation of property" and the implementation of "a regulation that permanently requires a property owner to sacrifice all economically beneficial uses of his or her land." *Id*. But "most takings claims turn on situation-specific factual inquiries." *Id*. at 31–32.

Plaintiffs argue that under *Arkansas Game & Fish Comm'n v. United States*, they have adequately pled a Fifth Amendment taking. 568 U.S. 23 (2012). In

---

⁹ *See, e.g., United States v. St. Bernard Parish*, 756 F.2d 1116 (5th Cir. 1985); *Mid-Am. Nat'l Bank v. First Sav. & Loan Ass'n*, 737 F.2d 638, 640 (7th Cir. 1984); *Hofbauer v. Nw. Nat'l Bank of Rochester*, 700 F.2d 1197, 1200 (8th Cir. 1983); *Arvai v. First Fed. Sav. & Loan Ass'n*, 698 F.2d 683 (4th Cir.1983); *Harris v. Nationwide Mut. Fire Ins. Co.*, 832 F.3d 593, 596 (6th Cir. 2016); *Emody v. Manning*, No. 11-42-DLB, 2011 WL 6258300, at *5 (E.D. Ky. Dec. 15, 2011).

17

*Arkansas Game & Fish* the Supreme Court reviewed the actions of the Army Corps of Engineers, which many years before had built a dam downstream from timber managed by the Arkansas Game & Fish Commission. The Corps "determine[d] the rates at which water would be released from the Dam" and for several years slowed the rate of release (as compared to years prior and the recommendations in their official Manual), so as to prolong the growing season for farmers below the Dam. *Id*. at 27. This caused flooding that interfered with the growth of hardwood trees. *Id*. at 28. The Supreme Court held "that recurrent floodings, even if of finite duration, are not categorically exempt from Takings Clause liability." *Id*. at 27.

Based on this holding, it appears that flooding of the sort experienced by the Plaintiffs could be actionable under the Takings Clause. But it does not necessarily follow that the Plaintiffs state a plausible claim against the Defendants. The defendants in *Arkansas Game & Fish caused* the flooding: first by constructing the dam then by altering the release of water from the dam. This was significant to the Court, which considered "the degree to which the invasion is intended or is the foreseeable result of authorized government action" to be highly relevant, *Id*. at 39, since flooding must be "government-induced" in order to be compensable. *Id*. at 34. Plaintiffs' flooding was arguably foreseeable when Defendant Pahnke granted them the permits they requested without following Ordinance 703. But Defendants did not induce the flooding. They permitted the Plaintiffs and their predecessors in interest to build on their own property. Plaintiffs propose reading the required "government action" out of the equation. Although they attempt to distinguish the Defendants'

18

cases to the contrary,[10] Plaintiffs provide no case other than *Arkansas Game & Fish* in support of their position. And *Arkansas Game & Fish* requires government action that "induced" the taking.

Counts I and II are dismissed for failure to state a claim.

### 3. Count VII: Denial of Access

Count VII alleges a denial of access to the courts perpetrated by all Defendants. Plaintiffs say that, should the other federal claims (Counts, I, II, and III) be time-barred, "the loss of each such claim represents a deprivation of each plaintiff's rights of access to the courts, in violation of the First, Fifth, and Fourteenth Amendments." (Dkt. 35, ¶ 203–04). The Court has not determined the other federal counts (Counts I, II, and III) are time-barred, but has found that Plaintiffs have failed to properly state a federal claim.

In order to bring a denial of access claim under § 1983, Plaintiffs are required to identify: "(1) a nonfrivolous, underlying claim; (2) the official acts frustrating the

---

[10] *See, e.g., St. Bernard Par. Gov't v. United States*, 887 F.3d 1354, 1357 (Fed. Cir. 2018) (plaintiffs "claimed that the government was liable for flood damage to their properties caused by Hurricane Katrina" because the state had failed to keep flood protection infrastructure in good repair, but the court held that "the government cannot be liable on a takings theory for inaction"); *Petersen v. Dane Cnty.*, 136 Wis. 2d 501, 505–07 (Ct. App. 1987) (Plaintiff may not claim his land has been taken when the condition that devalues his lot was created by his predecessor in title); *Sorrells v. City of Macomb*, 2015 IL App (3d) 140763 (municipality's failure to follow "applicable drainage standards, engineering standards, laws and ordinances" was not a taking because flooding was caused by private developers); *Sik v. Verhelst Bros.*, No. A09-329, 2009 WL 4573827, at *2–3 (Minn. Ct. App. Dec. 8, 2009) (county's failure to enforce a conditional-use permit did not constitute a taking); *Dugan v. Town of Paradise Valley*, No. 1 CA-CV 10-0133, 2011 WL 1483724, at *4 (Ariz. Ct. App. Apr. 19, 2011) (failure to enforce regulations governing neighbor's land use did not constitute a regulatory taking); *Welgosh v. City of Novi*, 2015 WL 1261470 (Mich. Ct. App. Mar. 19, 2015) (municipality's failure to enforce building code was not inverse condemnation although basement flooding followed); *and Bargmann v. Neb. Dep't of Roads*, 257 Neb. 766, 774-75 (1999) (allegations that governmental entity allowed third parties to construct obstruction within a floodplain which caused plaintiff's property to flood did not constitute a taking).

litigation; and (3) a remedy that may be awarded as recompense but that is not otherwise available in a suit or settlement." *Harer v. Casey*, 962 F.3d 299, 308 (7th Cir. 2020) (citations omitted). Plaintiffs fail on the first prong as they are unable to establish a nonfrivolous federal claim. Count VII is dismissed.[11]

### B. State Claims

Recognizing the particularly local nature of this dispute, and having dismissed all federal claims, the Court will relinquish supplemental jurisdiction over the state claims (inverse condemnation, nuisance, and trespass). The Court may do so at its discretion, if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367.

### IV.   Conclusion

For the stated reasons, Defendants' motion to dismiss (Dkt. 41) is granted. Count I is dismissed with prejudice to the extent that it alleges violations of the FDPA or the NFIA. Count III is dismissed with prejudice. Plaintiffs have until July 6, 2021 to file an amended complaint consistent with this opinion or judgment will enter.

E N T E R:

Dated: June 7, 2021

*Mary M Rowland*

MARY M. ROWLAND
United States District Judge

---

[11] Finding Plaintiffs have failed to state a federal claim, the Court does not address defendants' statute of limitation arguments, qualified and legislative immunity arguments, and Plaintiffs' failure to plead personal involvement of each individual defendant for section 1983 purposes.