UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Craig Billie, et al., | |
| Plaintiffs, | Case No. 20-cv-3294 |
| v. | Judge Mary M. Rowland |
| Village of Channahon, et al. | |
| Defendants. | |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs are homeowners living on a flood prone lot within the Village of Channahon. During significant rain events, Plaintiffs' basements flood. Plaintiffs blame the Village and several of its former trustees and employees, suing them for constitutional violations under 42 U.S.C. § 1983 and under Illinois law. Defendants have moved to dismiss the latest version of Plaintiffs' complaint, the third amended complaint. [67]. For the reasons explained below, this Court grants Defendants' motion.

I.  Background

This is the second time this Court has considered the adequacy of Plaintiffs' claims. This Court presumes familiarity with, and incorporates by reference, its prior opinion on Defendants' motion to dismiss, *see Billie v. Village of Channahon*, No. 20-CV-3294, 2021 WL 2311966 (N.D. Ill. June 7, 2021). The following facts come from the third amended complaint [63].

1

### A. Parties

Plaintiffs are all homeowners in the Indian Trails North, Unit 1 Subdivision (ITN1) in the Village of Channahon, Illinois. [63] ¶ 2. Each Plaintiff's home sits on a flood prone lot included within or immediately beside a known DuPage River Special Flood Hazard Area. *Id.* Plaintiffs claim that their homes become an "unwanted public floor water storage area" whenever the DuPage River surface flood water accumulates in this flood plain and that they have suffered damages from this recurrent flood water issue. *Id.* ¶ 3.

Plaintiffs sue the Village of Channahon, a municipal corporation; James Bowden, the former Village Administrator; Wayne Chesson, former Village President; Joseph Cook, Jr., former Village President and past Village Trustee; Edward Dolezal, long-term Village Director of Public Works, Thomas Durkin, the Village Administrator; Village Trustees Samuel Greco, Chantal Host, Scott McMillian, Patricia Perinar, Marck Scaggs, Scott Slocum, Jr.; Janet Schumacher, the Village President; David Silverman, Village Attorney; and Jeffrey Corso, the representative of the Estate of Thomas C. Pahnke, who was the former Village Building and Zoning Officer. *Id.* ¶¶ 17–31.

### B. Defendants' Alleged Wrongdoing

In 1993, the Village approved the subdivision where Plaintiffs live. *Id.* ¶¶ 56, 67. Between September 1993 and August 1994, the Village received permit applications for each unimproved ITN1 Lot 11 through 17 to construct on each lot a new single-family house with an excavated basement and excavated septic system

improvement to each house. *Id.* ¶ 68. Defendant Pahnke granted each permit application. *Id.* ¶ 72. Each house on improved ITN1 Lot 11–17 experienced basement flooding in July 1996, October 2001, August 2007, September 2008, December 2008, March 2009, April 2013, May 2017, October 2017, February 2018, April 2019, and May 2020. *Id.* ¶¶ 75, 92, 93, 128, 139, 144, 146, 150, 157.

Defendant Chesson went to ITN1 with a FEMA disaster relief representation in 1996 to view the flooding. *Id.* ¶ 76. Afterward, Chesson allegedly "came to believe" that the basement floor elevations "may have been too deep." *Id.* ¶ 78. Plaintiffs claim that a May 1998 FEMA letter confirmed Chesson's belief, *id.* ¶ 80, and that after reading this letter, Chesson, Bowden, Silverman, Greco, Pahnke, and Dolezal knew that the basement floor elevations "were too deep" and violated Village Ordinance 703 and 44 C.F.R. §§ 59.1–60.26, *id.* ¶ 84.[1] According to Plaintiffs, these Defendants began a "conspiracy of silence" ensuring that Plaintiffs would never learn about the violations of Ordinance 703 and 44 C.F.R. §§ 59.1–60.26. *Id.* ¶ 86.

In 2009, several ITN1 households contacted the Village urging an investigation into successive basement flooding events. *Id.* ¶ 97. An engineering firm performed a drainage investigation and provided an initial written report in June 2009. *Id.* ¶ 101. It found a "direct association" between the DuPage River water surface elevation and ITN1 house basement flooding frequency and severity. *Id.* ¶ 104.

On October 12, 2009, Plaintiff Dawn Billie wrote Defendant Cook a letter seeking Village buyout of her ITN1 Lot 16 due to recurrent basement flooding. *Id.* ¶

---

[1] For discussion about the ordinance and regulations, see this Court's prior opinion. *See Billie*, 2021 WL 2311966, at *2.

109. Cook replied by email on October 19, 2009, informing Billie that he had asked Village staff to "investigate," and that the results of the investigation had "not shown that a single state or village regulation was broken." *Id.* ¶ 112. Plaintiffs assert this statement was false because no investigation occurred and Cook knew that Pahnke had violated Ordinance 703. *Id.* ¶ 113.

In May 2017, after Lots 11–17 experienced basement flooding again, Dawn Billie sent an email to Defendant Schumacher hoping she could help find a flooding solution. *Id.* ¶ 140. In reply, Schumacher described the "inherent risks of living so close to water" and stated that "we will continue to look for and pursue viable remedies." *Id.* ¶ 141. Plaintiffs claim that Schumacher's promise was false because she knew no viable flooding solutions or remedies existed. *Id.* Billie wrote Schumacher again on May 3, 2017, asking the Village to "put some pressure on the government agencies that have the power to offer solutions." *Id.* ¶ 142.

By February 2018, Billie developed the belief that the Village had been "solely at fault" for the recurrent basement flooding and let Schumacher know her belief in an email. *Id.* ¶ 147. Schumacher responded by email to Dawn, stating that the Village had "followed engineering" standards. *Id.* ¶ 148. Billie forwarded this correspondence to Defendant Slocum to notify him about what Billie perceived as Schumacher's false statement. *Id.* ¶ 149.

Beginning in May 2019, Dawn began to research what standards governed the ITN1 Lot 11–17 development and approval of Lot 11–17 improvements. *Id.* ¶ 151. In July 2019, the United States Army Corps of Engineers (USACE) stated that a slurry-

4

wall project for the Indian Trail Development, which included Plaintiffs' properties, would not be built since it did not meet USACE's cost-benefit criteria. *Id.* ¶ 152.

In January 2020, Dawn made a presentation to Schumacher, Greco, Host, McMillian, Perinar, Scaggs, and Slocum, which Dolezal, Durkin, and Silverman also attended. *Id.* ¶ 154. She informed them of her belief that the ITN1 Lots 11–17 developmental evaluation and construction process violated flood management criteria regulation, therein causing recurrent basement flooding. *Id.* ¶ 154. Later that month, Craig and Dawn Billie met with Dolezal and Durkin and made a buyout request to the Village for Lot 16. *Id.* ¶ 156. The Village has denied this buyout request through its "inaction and silence." *Id.*

### C. Plaintiffs' Claims

In the TAC, Plaintiffs bring claims for: Fifth Amendment takings under 42 U.S.C. § 1983 (Counts I and II against the Village and the individual Defendants, respectively); deprivation of Plaintiffs' "statutory rights" under Section 1983 against the individual Defendants (Count III); state-law claims for inverse condemnation against the Village (Count IV), nuisance against the Village (Count V); trespass against the Village (Count VI); and deprivation of Plaintiffs' right of access to the courts against all Defendants under Section 1983 (Count VII).

Defendants have moved to dismiss the TAC in its entirety. [67].

## II. Legal Standard

A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a claim, not the merits of the case. *Gunn v. Cont'l Cas. Co.*, 968 F.3d 802, 806 (7th Cir. 2020). To

survive a motion to dismiss under Rule 12(b)(6), the claim "must provide enough factual information to state a claim to relief that is plausible on its face and raise a right to relief above the speculative level." *Haywood v. Massage Envy Franchising, LLC*, 887 F.3d 329, 333 (7th Cir. 2018) (quoting *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014)); *see also* Fed. R. Civ. P. 8(a)(2) (requiring a complaint to contain a "short and plain statement of the claim showing that the pleader is entitled to relief"). A court deciding a Rule 12(b)(6) motion accepts the well-pleaded factual allegations as true and draws all permissible inferences in the pleading party's favor. *Degroot v. Client Servs., Inc.*, 977 F.3d 656, 659 (7th Cir. 2020). Dismissal for failure to state a claim is proper "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007).

### III. Analysis

#### A. Count III: Statutory Violations

In Count III, Plaintiffs reassert a Section 1983 claim for "statutory right deprivation" based upon the individual Defendants' supposed violations of the NFIA and FDPA. [63] at Count III. This Court previously dismissed this claim with prejudice, *Billie*, 2021 WL 2311966, at *8, and it is on this basis that Defendants argue that dismissal is again proper, [68] at 15–16.

In response, Plaintiffs assert that they did not intend to replead this claim and only included it to "avoid any claim waiver argument." [73] at 9–10. Given this concession, Count III remains dismissed with prejudice.

B.   **Counts I and II: Fifth Amendment Takings**

Plaintiffs also reassert Fifth Amendment takings claims against the Village (Count I) and the individual Defendants (Count II), which this Court gave leave to replead. *See Billie*, 2021 WL 2311966, at \*10.

The Fifth Amendment's takings clause provides that private property shall not "be taken for public use without just compensation." U.S. Const. amend. V. A property owner possesses an "actionable Fifth Amendment takings claim when the government takes his property without paying for it." *Knick v. Township of Scott*, 139 S. Ct. 2162, 2167 (2019). The Supreme Court has held that "government-induced flooding of limited duration may be compensable." *Ark. Game & Fish Comm'n v. United States*, 568 U.S. 23, 34 (2012); *see also Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2071 (2021) ("And the government likewise effects a physical taking when it occupies property—say, by recurring flooding as a result of building a dam."). As with all physical takings, however, Plaintiffs must plausibly allege that the government directly and proximately caused the flooding. *Ministerio Roca Solida, Inc. v. United States*, 156 Fed. Cl. 346, 365 (2021) (citing *St. Bernard Par. Gov't v. United States*, 887 F.3d 1354, 1362 (Fed. Cir. 2018)). In other words, takings claims must be based "on affirmative government acts," and the government cannot be liable for a mere "failure to act." *St. Bernard Par. Gov't*, 887 F.3d at 1360–61.

In assessing the prior version of Plaintiffs' complaint, this Court found that Plaintiffs had failed to state a viable takings claim because they had not alleged any facts to suggest "government-induced" flooding, as they must under *Arkansas Game*

7

*& Fish Commission. Billie*, 2021 WL 2311966, at *9 (citing *Ark. Game & Fish Comm'n*, 568 U.S. at 34). Rather, the prior complaint alleged only that the government granted permits to develop the subdivision in contravention of Ordinance 703. *Id.* at *9. The TAC fares no better.

In the TAC, Plaintiffs add allegations that certain individual Defendants refused to build a "slurry wall" or "concrete barrier" to surround ITN1 which would have stopped "surface flood water from reaching the slough flood plain." [63] ¶¶ 176, 186, 193, 201, 208. These allegations do not state a viable takings claim, however, because they attempt to hold the Village liable for failing to take action. It is well-established that failure to take action remains insufficient to state a Fifth Amendment takings claim. *See St. Bernard Par. Gov't*, 887 F.3d at 1361 (noting that "takings liability does not arise from government inaction or failure to act") (citing *United States v. Sponenbarger*, 308 U.S. 256 (1939)); *see also Nicholson v. United States*, 77 Fed. Cl. 605, 620 (2007) ("In no case that we know of has a governmental agency's failure to act or to perform its duties correctly been ruled a taking.").

Plaintiffs also point to new allegations that the Village allowed the subdivision to be developed with basements lower than the BFE[2] to help owners evade flood insurance obligations. [73] at 8. Specifically, the TAC alleges that Pahnke, with Silverman's assistance, "chose to defeat FEMA regulations for new development in known flood prone, unimproved areas with the approach taken during review of

---

[2] BFE refers to "basement flood elevation," or the "elevation of surface water resulting from a flood that has a 1% chance of equaling of exceeding that level in any given year." *Residential Buildings with Permits*, FEMA (Aug. 3, 2021), https://www.fema.gov/floodplain-management/manage-risk/residential-buildings-basements.

8

proposed subdivision plat and building plans by the location of planned residential new house construction on each lot at a point outside the BFE lot elevation in order for Village approvals to be granted." [63] ¶ 61; *see also id.* ¶¶ 58–60, 62–63. Such an approach, the TAC alleges, "allowed for maximum permitted development" because each new house "was no longer in a known flood hazard area," and thus, would not require flood insurance coverage. [63] ¶ 61. While these allegations suggest an improper motive for the Village's approval of the ITN1 construction, they do not state a constitutional takings claim. To reiterate, in the flooding context, courts have only recognized unconstitutional takings when the flooding is "government-induced," such as when the government builds a project that directly and proximately causes flooding. *Ark. Game & Fish Comm'n*, 586 U.S. at 34; *see also, e.g., Messing v. Town of Hamden*, 459 F. Supp. 3d 464, 465, 466–69 (D. Conn. 2020) (holding that a property owner stated a plausible takings claim based upon allegations that his local government repaved the road on which his property sits, removing a preexisting drainage system and changing the grading of the road which resulted in flooding on his property).

Plaintiffs' cited cases underscore this principle that physical takings occur only where the government directly causes the flooding. *See* [73] at 6–8. For example, Plaintiffs rely heavily upon *Ridge Line, Inc. v. United States*, where the Federal Circuit found that the United States Postal Service's building of a facility that increased storm water runoff onto a plaintiff's property could form the basis for an inverse condemnation claim. 346 F.3d 1346, 1353 (Fed. Cir. 2003). In *United States*

9

*v. Kansas City Life Ins. Co.*, 339 U.S. 799, 801 (1950), the Court held that the United States government's construction and operation of a dam resulted in a taking of the respondent's farmland because it destroyed the farm's agricultural value. In *United States v. Winnebago Tribe of Nebraska*, 542 F.2d 1002, 1007 (8th Cir. 1976), the Eighth Circuit described a taking resulting "from a direct physical invasion of" land by "waters of the United States" from the government's Oxbox Recreation Lakes, Snyder-Winnebago Complex, Missouri River Recreation Lakes Project that diminished the "agricultural productivity" of the plaintiff's land. And in *United States. V. Wells*, 1978 U.S. Dist. LEXIS 16147, at *13 (D. Or. 1978), the court considered how to compensate a landowner in connection with a government dam "peaking" project which raised the maximum reservoir capacity of water held behind the dam. In all of the foregoing cases upon which Plaintiffs rely, government construction directly caused the flooding on private land. That is not the case here. Plaintiffs have alleged that the government granted permits to build private property on land that was already flood prone; they have not alleged that the government induced the flooding. Plaintiffs cite no authority (and this Court knows of none) for the legal theory that a government's issuance of permits (at Plaintiffs' requests) to build on flood prone land rises to the level of a constitutional taking.

For these reasons, this Court concludes that Plaintiffs have failed to state a cognizable Fifth Amendment takings claim. Counts I and II are dismissed, this time with prejudice.

### C. Counts IV–VII: Denial of Access and State-Law Claims

In Count VII, Plaintiffs allege a Section 1983 claim based upon Defendants' violation of the constitutional right to access courts to the extent any of their other claims are determined to be time-barred. [63] at Count VII. A claim for meaningful and effective access to court requires Plaintiffs to identify: (1) a nonfrivolous, underlying claim; (2) the official acts frustrating the litigation; and (3) a remedy that may be awarded as recompense but that is not otherwise available in a suit or settlement. *Harer v. Casey*, 962 F.3d 299, 308 (7th Cir. 2020).

Plaintiffs' denial of access claim fails to the extent it is based upon the other federal claims (Counts I–III). Although this Court has not determined those claims time-barred, it has dismissed them with prejudice for failure to state a claim. Because those federal constitutional claims have now been dismissed with prejudice, they cannot serve as "nonfrivolous, underlying claims" that satisfy the first prong of a denial of access claim. *Id.*; *see also Billie*, 2021 WL 2311966, at *10.

Plaintiffs' denial of access claim is also unripe to the extent Plaintiffs base it upon the remote contingency that the pendent state-law claims in Counts IV–VI for trespass, inverse condemnation, and nuisance will be deemed time-barred. Plaintiffs have alleged their denial of access claim in Count VII only as "an alternative remedy should any claim set forth above be found as time barred." [63] ¶ 212. This Court will not, however, rule upon the merits of the state-law claims in Counts IV–VI. Plaintiffs base these state-law claims upon supplemental jurisdiction rather than diversity, *see* [63] ¶ 5, and the "sensible presumption [is] that if the

11

federal claims drop out before trial, the district court should relinquish jurisdiction over the state-law claims," *Refined Metals Corp. v. NL Industries Inc.*, 937 F.3d 928, 935 (7th Cir. 2019) (internal quotation marks and citation omitted). As this Court will relinquish supplemental jurisdiction over the state-law claims in Counts IV–VI, Plaintiffs' denial of access claim—to the extent alleged as an alternative remedy in case the state-law claims are time-barred—is unripe. *See Harer*, 962 F.3d at 310–11 ("With the ultimate resolution of their wrongful death case in doubt, the Harers' access-to-court claim is not ripe for judicial review.").

The Seventh Circuit has explained that the third element of a denial of access claim presents a problem where, as here, Plaintiffs bring a denial of access claim alongside underlying claims because it is "just too early to say" whether "the remedy" Plaintiffs seek is "not otherwise available" in their pending lawsuit. *Id.* at 309; *see also In re Maxy*, 674 F.3d 658, 661 (7th Cir. 2012) ("Relief for the denial of access to the courts is intended to remedy rights denied in a *separate case* due to the impediment") (emphasis added). Because "[r]esolution of the underlying claims is essential" to the viability of a denial of access claim, and the underlying claims have not been resolved on their merits, Plaintiffs' denial of access claim is unripe. *Harer*, 962 F.3d at 309; *see also Voss v. Carr*, No. 19-CV-790-JDP, 2019 WL 5802556, at *2 (W.D. Wis. Nov. 7, 2019) (noting that an access-to-courts claim "is not ripe until [the underlying claim] is resolved") (alteration in original) (quotation omitted). This Court notes that Plaintiffs may theoretically bring a denial of access claim if a court later deems the state-law claims time-barred. But is it not currently actionable—and may

12

not ever be actionable—unless a court determines that Plaintiffs cannot proceed with those state-law claims. *See Iscene, LLC v. Bd. of Trustees*, No. 20-CV-0365-WJM-SKC, 2020 WL 5810066, at *6 (D. Colo. Sept. 30, 2020) (remanding a case where the plaintiff asserted a federal denial of access claim alongside a state-law defamation claim because the denial of access claim could not be viable unless a court determines that the plaintiff could not proceed with its defamation claim).

For these reasons, this Court dismisses Plaintiffs' denial of access claim in Count VII without prejudice and declines to exercise supplemental jurisdiction over the pendent state-law claims in Counts IV–VI.

## IV. Conclusion

For the reasons explained above, this Court grants Defendants' motion to dismiss [67]. This Court dismisses Plaintiffs' claims in Counts I–III with prejudice and dismisses Counts IV–VII without prejudice. Civil case terminated.

E N T E R:

Dated: March 22, 2022

MARY M. ROWLAND
United States District Judge

13